UNPUBLISHED

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

FRANCES E. KIRK, Widow of Lat
Kirk,
<u>Petitioner,</u>

v.

DIRECTOR, OFFICE OF WORKERS'

COMPENSATION PROGRAMS, UNITED
STATES DEPARTMENT OF LABOR;
ISLAND CREEK COAL COMPANY;
THYSSEN MINING CONSTRUCTION
COMPANY,
<u>Respondents.</u>

No. 95-1710

On Petition for Review of an Order
of the Benefits Review Board.
(93-1321-BLA)

Argued: March 5, 1996

Decided: May 23, 1996

Before HALL, WILKINS, and WILLIAMS, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion. Judge Williams wrote
an opinion concurring in the judgment.

_____

**COUNSEL**

**ARGUED:** Martin Douglas Wegbreit, CLIENT CENTERED
LEGAL SERVICES OF SOUTHWEST VIRGINIA, INC., Castle-

wood, Virginia, for Petitioner. Mary Lou Smith, HOWE, ANDER-SON & STEYER, Washington, D.C.; Douglas Allan Smoot, JACKSON & KELLY, Charleston, West Virginia, for Respondents. **ON BRIEF:** William H. Howe, Daniel E. Durden, HOWE, ANDER-SON & STEYER, Washington, D.C.; Ann B. Rembrandt, JACKSON & KELLY, Charleston, West Virginia, for Respondents.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Frances Kirk, the widow of Lat Kirk, petitions for review of the denial of her claim for survivor's benefits under the Black Lung Benefits Act, 30 U.S.C. §§ 901 et seq. Because the finding that pneumoconiosis did not contribute to or hasten the miner's death is in accordance with law and supported by substantial evidence, we affirm.

I.

Lat Kirk worked in the mines for over twenty years. He also smoked cigarettes and drank a good deal of alcohol. In 1986 and 1987, he was hospitalized on three occasions for severe alcohol abuse.

On August 17, 1988, in Columbus, Ohio, Kirk suffered a massive right subdural hematoma.[1] He never regained consciousness.

On October 4, 1988, he was transferred to a hospital in Lebanon, Virginia, near his home. An x-ray taken on admission showed a clear right lung but atelectasis and/or infiltrate in the middle and lower left lung. A laboratory culture revealed a bacterial infection, which

_____

[1] How he sustained this injury is not in the record.

2

quickly worsened into severe bronchopneumonia. He then improved gradually. On October 20, as preparations were underway to transfer Kirk to a nursing home, his fever spiked to 102 degrees. More lab work was done, and he was found to have multiple bacterial infections, not only of the lung but at a gastrostomy site. His bronchopneumonia steadily worsened, and he died on November 14, 1988.

An autopsy was performed. Just about everything that could collapse in the human cardiopulmonary system had collapsed. Kirk's lungs had filled with secretions because of his inability to cough, which was in turn caused by his lack of consciousness. Some gastric contents had also been aspirated into his lungs. His bronchopneumonia was purulent (i.e., pus-forming), and the infection had spread to adjacent ribs (osteomyelitis).

Beneath this acute illness, Kirk's lungs showed several chronic diseases as well. He had bullous emphysema, interstitial fibrosis, healed granulomas of the right lung, and mild to moderate coal worker's pneumoconiosis.

Kirk's widow filed this claim for survivor's black lung benefits. Two entities -- Island Creek Coal Company and Thyssen Mining Construction Company -- were identified as responsible operators. An administrative law judge (ALJ) heard the claim and rejected it. The Benefits Review Board of the Department of Labor (BRB) affirmed, and Mrs. Kirk petitioned for review.

II.

The permanent regulations at 20 C.F.R. Part 718 apply to this claim. Therefore, Mrs. Kirk must prove by a preponderance of the evidence that her husband's death was "due to pneumoconiosis." 20 C.F.R. § 718.205(a), (c). A death is due to pneumoconiosis if the disease actually "hastens death in any way." Shuff v. Cedar Coal Co., 967 F.2d 977 (4th Cir. 1992), cert. denied, 506 U.S. 1050 (1993). We must affirm the denial of benefits if it is in accordance with law and supported by substantial evidence. Amigo Smokeless Coal Co. v. Director, OWCP, 642 F.2d 68 (4th Cir. 1981).

Some things are clear here. Coal mine employment did not cause Kirk's hematoma or resulting coma. Coal mine employment did not cause the bronchopneumonia; bacteria did. Mrs. Kirk's case depends solely on Dr. Robinette's opinion that pneumoconiosis weakened Kirk's lungs so as to make them more susceptible to death from severe bronchopneumonia.

Respondent Thyssen contends that such susceptibility would not constitute "hastening" under <u>Shuff</u>. We are not persuaded. Diseases, like jackals on the savanna, kill the weak more readily than the strong. Had the ALJ credited Dr. Robinette, Mrs. Kirk would be entitled to benefits under <u>Shuff</u>.

But the ALJ did not credit Dr. Robinette. Instead, he credited the army of well-credentialed pathologists marshaled by the respondents, who, unlike Dr. Robinette, had reviewed the autopsy slides.[2] The reports of these pathologists paint this scenario:

>(1) a person in a coma has no cough reflex;

>(2) phlegm and secretions that should be expectorated build up in the respiratory tract;

>(3) these secretions provide a prime breeding ground for bacteria;

>(4) pneumonia develops, producing more pus and more breeding ground; and

>(5) the victim eventually dies.

According to these doctors, coal mine employment played no role in Kirk's death; Kirk would have died at the same time in the same manner whether he had had pneumoconiosis or not. These opinions constitute substantial evidence.

_____

[2] Dr. Robinette is not a pathologist, though he did examine Kirk on a referral a couple of weeks before Kirk's death.

4

There is, however, one point on which the claimant can and does make some hay. One of the operators' physicians, Dr. Kleinerman, speculated at deposition that aspirated "food particles," inhaled when Kirk tried to eat while in a depressed state of consciousness, probably led to the bronchopneumonia. Mrs. Kirk makes a persuasive case that the doctor is wrong about this detail.

Mrs. Kirk concedes that "gastric contents" (though not "food particles") were found in Kirk's lungs at death, but asserts that there is nothing especially peculiar about that. Aspiration often occurs at or just before death.[3] There is no evidence that Kirk was given food by mouth at any point after he suffered his hematoma. Though reflux of and aspiration of gastric contents can occur in a tube-fed comatose patient, it is nigh impossible for a person, conscious or not, to aspirate only into the left lung, because of the size and location of the bronchi. Kirk's bronchopneumonia began in and for several weeks was confined to the left lung, so it is doubtful that aspiration of food caused it.

Though she has done so ably, the claimant has battled a straw man here. Lat Kirk died of bronchopneumonia; whether it was caused by unexpectorated pus or aspirated food is not relevant. The frailty of an irrelevant defense hypothesis does nothing to help Mrs. Kirk, because she has the burden of proof. She must show that her husband's death from bronchopneumonia was somehow hastened by pneumoconiosis. Dr. Robinette felt that it was, but we cannot say that the ALJ's decision to the contrary is unsupported by substantial evidence.[4]

The final decision of the BRB is affirmed.

<u>AFFIRMED</u>

_____

[3] Dr. Robinette estimated that three out of four autopsies reveal some aspirated stomach contents. The other medical propositions in this paragraph are from Dr. Robinette's deposition testimony.
[4] We reject Mrs. Kirk's assertion that the level of detail in the ALJ's opinion was insufficient. ALJs must explain their decisions well enough that we may engage in meaningful review, but they have no duty of prolixity.

WILLIAMS, Circuit Judge, concurring in the judgment:

I concur in the judgment that Mrs. Kirk is not entitled to benefits but write separately to dispel any suggestion that the "hastening death" standard in Shuff v. Cedar Coal Co. , 967 F.2d 977 (4th Cir. 1992), cert. denied, 506 U.S. 1050 (1993), would have been satisfied if the ALJ had credited the opinion of Dr. Robinette. The majority did not need to reach this issue because substantial, credible medical evidence supports the ALJ's conclusion that there was no relationship between Kirk's simple pneumoconiosis and his death.

I.

Our standard of review regarding a denial of benefits under the Black Lung Benefits Act is extremely deferential. As we explained in Grizzle v. Pickands Mather & Co./Chisholm Mines , 994 F.2d 1093, 1096 (4th Cir. 1993), "[l]ike the [BRB], we must affirm the factual findings of the ALJ if they are supported by substantial evidence." Substantial evidence means "`such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence consists of more than a scintilla of evidence but may be less than a preponderance. See Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). As we explained in Shively, "[i]f there is evidence to justify a refusal [to enter judgment as a matter of law] were the case before a jury, then there is `substantial evidence.'" Id. We must sustain the ALJ's decision, even if we disagree with it, provided it is supported by substantial evidence. See Smith v. Schweiker , 795 F.2d 343, 345 (4th Cir. 1986). The "`sole power to make credibility determinations and resolve inconsistencies in the evidence'" rests with the ALJ, not the reviewing court. Grizzle, 994 F.2d at 1096 (quoting Freeman United Coal Mining Co. v. Benefits Review Bd., 912 F.2d 164, 168 (7th Cir. 1990)). If the ALJ's decision is "adequately supported by the evidence and not inconsistent with the law[,] the [ALJ's] determination is conclusive, and it is immaterial that the facts permit the drawing of diverse inferences." Parker v. DOWCP , 590 F.2d 748, 749 (8th Cir. 1979).

II.

Assuming, without deciding, that Mrs. Kirk did not procedurally default in bringing this appeal,* the sole issue presented for review is whether substantial evidence supports the ALJ's decision to deny survivor's benefits because pneumoconiosis played no role in Kirk's death. Here, the overwhelming, substantiated medical evidence supports the ALJ's conclusion to deny benefits, thereby compelling us to affirm; we need proceed no further. The regulations concerning the award of survivor's benefits provide in pertinent part:

> For the purpose of adjudicating survivors' claims . . . death will be considered to be due to pneumoconiosis if any of the following criteria is met:
>
> (1) Where competent medical evidence established that the miner's death was due to pneumoconiosis, or
>
> (2) Where pneumoconiosis was a <u>substantially contributing cause or factor leading to the miner's death or where the death was caused by complications</u> of pneumoconiosis, or
>
> (3) Where the presumption set forth at § 718.304 is applicable.
>
> (4) However, survivors are not eligible for benefits where the miner's death was caused by a traumatic injury or the principal cause of death was a medical condition not related to pneumoconiosis, unless the evidence establishes that <u>pneumoconiosis was a substantially contributing cause of death</u>.

_____

*Before the BRB, Mrs. Kirk asserted that the ALJ did not make specific factual findings, failed to explain properly the evidence, failed to explain adequately his reasons for denying benefits, and failed to cite the applicable regulations. In challenging the sufficiency of the evidence before us, Mrs. Kirk is raising an issue for the first time on appeal. Even excusing Mrs. Kirk's procedural default, she cannot prevail on the merits.

20 C.F.R. § 718.205(c) (1995) (emphasis added). Kirk died of cardiopulmonary arrest, which was caused by respiratory failure, which, in turn, was caused by pneumonia. With the sole exception of Dr. Robinette, every physician opined that simple pneumoconiosis was not a factor causing the pneumonia, and thus, did not contribute to or hasten Kirk's death for purposes of § 718.205(c). In fact, six physicians opined categorically that simple pneumoconiosis played no role in Kirk's death. The ALJ's decision to deny benefits because pneumoconiosis played no role in Kirk's death is based on substantial evidence, contradicted only by Dr. Emory Robinette's unsubstantiated opinion that Kirk's death was related to his simple pneumoconiosis. A review of the record demonstrates that we must affirm given that substantial evidence supports the ALJ's decision.

First, Dr. Dwight Bailey's final diagnosis stated that Kirk suffered a subdural hematoma, right parietal infarct, recurrent pneumonia, respiratory failure, left lung atelectasis and enterococcus wound infection. In completing Kirk's death certificate, Dr. Bailey attributed Kirk's death to cardiopulmonary arrest due to respiratory failure due to pneumonia. Significantly, pneumoconiosis was not among the "significant conditions contributing to death" listed on the death certificate. (J.A. at 50.) Dr. Bailey opined neither that pneumoconiosis was a contributing cause of death nor that it hastened Kirk's death.

Second, Dr. Mario Stefanini's autopsy report, commissioned by Mrs. Kirk, while confirming that Kirk suffered from simple pneumoconiosis, did not state that pneumoconiosis contributed to or hastened Kirk's death. Rather, the autopsy report is conspicuously silent respecting whether pneumoconiosis contributed to or hastened Kirk's death.

Third, after evaluating the autopsy slides and medical records, Dr. Jerome Kleinerman, a pathologist and chairman of the committee that formulated the histologic standards for diagnosing pneumoconiosis, stated that Kirk suffered from simple pneumoconiosis. Moreover, Dr. Kleinerman opined that Kirk's death was due to a subdural hematoma, bronchopneumonia, cachexia and possible aspiration of food, via a food tube, into the lung. Quite revealingly, Dr. Kleinerman stated that "the minimal simple coalworkers pneumoconiosis . . . did not in anyway [sic] contribute to or cause[Kirk's] demise because the

8

coalworkers pneumoconiosis was so minimal in extent that it did not contribute in anyway [sic] to his death." (J.A. at 59.) Additionally, Dr. Kleinerman testified that Kirk's simple pneumoconiosis had no relationship to his bronchopneumonia, nor did it contribute to nor hasten Kirk's death. Finally, Dr. Kleinerman stated that Kirk would have died when and how he died regardless of whether he had simple pneumoconiosis.

Fourth, Dr. Raphael Caffrey, also after reviewing the autopsy slides and medical reports, found that while Kirk had simple pneumoconiosis, it neither contributed to nor hastened his death. According to Dr. Caffrey, there was no causal connection between Kirk's death and his simple pneumoconiosis. In fact, Dr. Caffrey was explicit in his conclusion, opining that "the simple coal workers pneumoconiosis did not in any way contribute to his death nor caused his death. The simple coal workers pneumoconiosis alone would not have caused him significant pulmonary impairment, in my opinion." (J.A. at 67.)

Fifth, Dr. Richard Naeye, Professor of Pathology, examined the autopsy slides and stated that Kirk's pneumoconiosis was "too mild to have had any role in this man's death." (J.A at 56.) Like Drs. Kleinerman and Caffrey, Dr. Naeye was a certified pathologist.

Sixth, Dr. Gregory Fino, a pulmonary specialist, concluded that Kirk did indeed suffer from simple pneumoconiosis, but died as a result of the subdural hematoma and its attendant complications. According to Dr. Fino, Kirk's simple pneumoconiosis was too mild to have contributed to or hastened his death. Dr. Fino's diagnosis that Kirk would have died when and how he died regardless of his simple pneumoconiosis comports with that of Drs. Kleinerman and Caffrey, thereby refuting Dr. Robinette's conclusion that simple pneumoconiosis contributed to Kirk's death.

Seventh, Dr. Thomas Jarboe, also a pulmonary specialist, opined that while Kirk suffered from simple pneumoconiosis, it was far too mild to have played any role in his death. Dr. Jarboe opined that Kirk's history of severe alcoholism and his smoking habit caused the conditions that led to Kirk's demise. Agreeing with his colleagues, Dr. Jarboe concluded that pneumoconiosis had "[no] significant effect on [Kirk's] course prior to his death." (J.A. at 81).

9

Eighth, after reviewing Kirk's medical records, Dr. W.K.C. Morgan, yet a third pulmonary specialist, concluded that pneumoconiosis neither contributed to nor hastened Kirk's death. Dr. Morgan attributed Kirk's demise to "bronchopneumonia and aspiration caused by impaired consciousness and an inability to cough out secretions." (J.A. at 128.) According to Dr. Morgan, Kirk's airway obstruction and resulting "impaired ventilatory capacity were not related to the minimal coal workers' pneumoconiosis, but to chronic airflow limitation induced by cigarette smoking." (J.A. at 129.) This surfeit of medical data constitutes substantial evidence supporting the ALJ's decision. See Doss v. DOWCP, 53 F.3d 654, 659 (4th Cir. 1995) (affirming the ALJ in holding that twelve x-rays, three well-reasoned medical opinions and non-qualifying blood gas and non-qualifying pulmonary function test results constituted substantial evidence and thus affirmed the ALJ).

In contrast to this abundant support for the conclusion that pneumoconiosis did not hasten Kirk's death, we have the contrary opinion of Dr. Emory Robinette, who concluded that Kirk died from respiratory complications due at least in part to coalworker's pneumoconiosis. For good reasons, the ALJ put little stock in Dr. Robinette's opinion: Dr. Robinette was not Kirk's treating physician and thus his opinion is not entitled to great weight, Kirk's protestations to the contrary notwithstanding; rather, Dr. Robinette saw Kirk one time -- while Kirk was comatose and on his deathbed. Unlike Drs. Naeye, Kleinerman, and Caffrey, Dr. Robinette did not examine the autopsy slides to form his opinion, nor was Dr. Robinette a pathologist. Dr. Robinette conceded on cross-examination that he did not know that Kirk smoked up to two packs of cigarettes per day for several years. Critically, Dr. Robinette could offer no reasoning or rationale for arriving at the conclusion that simple pneumoconiosis contributed to or hastened Kirk's death; in fact, by his own admission, Dr. Robinette reviewed only Drs. Stefanini's and Naeye's pathological reports, and neither states that pneumoconiosis contributed to nor hastened Kirk's death. Dr. Robinette's "opinion" is no more than a shot in the dark; it is not based on any objective medical data.

III.

In light of this evidence, I do not agree with the premise on page four of the majority opinion that the "hastening death" standard under

10

Shuff can be satisfied by crediting an unsubstantiated opinion that pneumoconiosis weakened Kirk's lungs, thereby rendering him more susceptible to death from severe bronchopneumonia. Whereas the overwhelming medical evidence in Kirk's case eliminates any possibility that pneumoconiosis hastened his death, in Shuff we confronted inconclusive medical evidence and an inconclusive determination by the ALJ. The Shuff court concluded that"pneumoconiosis should be considered a substantially contributing cause of a miner's death if it actually hastened the miner's death." Shuff, 967 F.2d at 979-80 (emphasis added) (internal quotation marks omitted). In Shuff, the ALJ in fact stated that pneumoconiosis "may have hastened . . . death," yet denied benefits because the miner's death from pancreatic cancer was "imminent." Id. at 979 (internal quotation marks omitted). According to the ALJ, therefore, pneumoconiosis could not have contributed to or hastened the miner's death. Because we could not determine in Shuff whether the ALJ concluded that pneumoconiosis substantially contributed to or actually hastened the miner's death, we reversed a denial of survivor's benefits and remanded the case to the BRB for remand to the ALJ given "the inconclusive nature" of the ALJ's findings regarding whether pneumoconiosis had hastened death. See id. at 980. Also, the ALJ's opinion did not provide what evidence did or did not support his conclusion; rather, his opinion merely recited that although metastatic pancreatic cancer was the predominant cause of Shuff's death, the immediate precipitating cause of death was pneumonia; thus, there was no explanation as to whether the pneumonia was caused by pneumoconiosis, see id. at 979, and hence the need arose to make this factual determination on remand, see id. at 980.

In contrast with Shuff, in the instant appeal a plethora of medical evidence establishes conclusively that pneumoconiosis did not contribute to or hasten Kirk's death to any degree. Indeed, the evidence demonstrates that simple pneumoconiosis was not a factor at all in Kirk's death. Given this conclusive evidence, we need not entertain the academic issue of whether the Shuff"hastening death" standard may be satisfied if a miner's pneumoconiosis renders him more susceptible to pneumonia. Accordingly, I cannot agree with the majority's assertion that if the ALJ accepted "Dr. Robinette's opinion that pneumonoconiosis weakened Kirk's lungs so as to make them more susceptible to death from severe bronchopneumonia . . . Mrs. Kirk

11

would have been entitled to benefits under <u>Shuff</u>." Maj. op. at 4. Given the conclusive nature of the evidence, our inquiry terminates prior to the majority's reaching out to address the "hastening death" standard under <u>Shuff</u>.

Even if the ALJ had accepted Dr. Robinette's opinion that pneumoconiosis played no role in Kirk's death, Mrs. Kirk would not have been entitled to benefits. Dr. Robinette's unsubstantiated and uncorroborated opinion, standing alone, would not constitute substantial evidence in support of an award of benefits. Not only, therefore, is there no basis for reaching the issue of whether Mrs. Kirk would be entitled to benefits under <u>Shuff</u> had the ALJ credited Dr. Robinette's testimony, but the majority's conclusion is simply contrary to the medical evidence. Moreover, under the majority's interpretation of the <u>Shuff</u> "hastening death" standard, virtually every miner with pneumonoconiosis, or his survivor, would qualify for benefits.

IV.

I concur in the holding that Mrs. Kirk is not entitled to benefits, but I cannot concur in the majority's reasoning in arriving at that conclusion. Here, substantial evidence, indeed, overwhelming evidence, supported the ALJ's conclusion to deny benefits based on the fact that simple pneumoconiosis played no role in Kirk's death. This conclusion being amply supported, we need not reach the further issue of the "hastening death" standard under <u>Shuff</u>. Accordingly, I concur only in the judgment.

12